Raj V. Abhyanker, California SBN 23328
raj@legalforcelaw.com

LEGALFORCE RAPC WORLDWIDE, P.C.
1580 W. El Camino Real, Suite 10
Mountain View, CA 94040
Telephone:    (650) 965-8731
Facsimile:    (650) 989-2131

Attorney for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LEGALFORCE RAPC WORLDWIDE, P.C. | Case No.:  3:25-cv-7921 |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | 1. TRADEMARK INFRINGEMENT, 15 U.S.C. § 1114; |
| SQUADHELP LLC, and DOES 1-5, | 2. TRADEMARK INFRINGEMENT, 15 U.S.C. § 1125(a); |
| Defendants. | 3. CYBERPIRACY, 15 U.S.C. § 1125(d) AGAINST TRADEMARK.IO AND TRADEMARK.AI; |
| | 4. CYBERPIRACY AGAINST ATOM.COM; |
| | 5. TRADEMARK INFRINGEMENT, CALIFORNIA COMMON LAW; |
| | 6. CALIFORNIA UNFAIR COMPETITION, CAL. BUS. & PROF. CODE § 17200, ET SEQ. |
| | **JURY TRIAL REQUESTED** |

1.   Plaintiff LegalForce RAPC Worldwide, P.C. ("Trademarkia" or "Plaintiff"), a California Professional "S" corporation, by and through its counsel, brings this Complaint against Defendant Squadhelp LLC ("Trademark.io" or "Defendant"), an Illinois limited liability company and DOES 1-5 (collectively, "Defendants").  Plaintiff reserves the right to amend to add Trust Tree Legal, P.C. and others as defendants as discovery may show its direct role in the infringing conduct.  Plaintiff complains and alleges upon information and belief as follows:

**NATURE OF ACTION**

2.   Trademarkia brings this action to stop Trademark.io's unlawful conduct of cyberpiracy and infringement of Trademarkia's trademarks, which has caused Trademarkia significant monetary damage and harm to Trademarkia's brand and reputation, and has caused substantial consumer confusion as to the commercial source of Trademarkia's services.

**FACTUAL ALLEGATIONS**

3.   Plaintiff is the owner of two (2)  U.S. federal trademark registrations:

| Marks | Reg. No. Reg. Date | Serial No. Filing Date | Goods/Services |
|---|---|---|---|
| Trademarkia | Reg: 3965290 May 24, 2011 | 85126556 Sep. 10, 2010  First Use in Commerce: Sep. 01, 2009 | Advertising, marketing and promotion services (35); Computer services, namely, providing search engines for obtaining trademark data from publicly available sources; providing temporary use of on-line non-downloadable software for trademark searching and managing trademark matters (42) |
| LegalForce Trademarkia | Reg: 5642937 Jan 1, 2019 | 87924397 May 24, 2018  First Use in Commerce: Apr. 13, 2012 | Providing temporary use of on-line non-downloadable software for trademark searching and managing trademark matters; Computer services, namely, providing search engines for obtaining trademark data from publicly available sources (42) |

4.   The marks "Trademarkia" and "LegalForce Trademarkia" were both declared incontestable through Reg. Nos. 3965290 and 5642937, respectively.

5.   The incontestable marks "Trademarkia" and "LegalForce Trademarkia" are collectively

referred to as the "TRADEMARKIA Marks."

6.   As a result of Plaintiff's exclusive, extensive, continuous, and worldwide use of the TRADEMARKIA Marks, the TRADEMARKIA Marks have come to signify Trademarkia as the leading provider of legal automation, business law, corporate law, and IP law services for businesses and consumers, and have achieved widespread public recognition and major press coverage from leading publications.

7.   As an industry leader, Trademarkia has invested well over ten million dollars promoting and advertising its brand and the TRADEMARKIA Marks to corporate and business customers worldwide.    To build and maintain its status as a leading nationally-recognized brand, Trademarkia has promoted the TRADEMARKIA Marks through advertising across a variety of media, including video, radio, and the Internet.

8.   For over a decade prior to Defendant's first infringing use, on at least August 29, 2024, the TRADEMARKIA Marks achieved this widespread recognition across the United States in many different industries and popular culture. Trademarkia-owned websites ("TRADEMARKIA domains") have become among the largest websites in the United States, with website traffic approaching that of some of the largest websites on the Internet by 2017. Additionally, Plaintiff attracted millions of page views and unique visitors to the TRADEMARKIA domains in the years prior.

9.   Moreover, Trademarkia has protected the TRADEMARKIA domains globally in multiple countries and regions in years prior to the Applicant's registration of Trademark.io, including:

| 1 | legalforcetrademarkia.com |
| 2 | legalforcetrademarkia.com.au |
| 3 | mytrademarkia.com |
| 4 | trademarkia.africa |
| 5 | trademarkia.ai |
| 6 | trademarkia.app |

| 7 | trademarkia.ar |
|---|---|
| 8 | trademarkia.au |
| 9 | trademarkia.biz |
| 10 | trademarkia.ca |
| 12 | trademarkia.ch |
| 13 | trademarkia.cl |
| 14 | trademarkia.cn |
| 15 | trademarkia.co |
| 16 | trademarkia.co.in |
| 17 | trademarkia.co.nz |
| 18 | trademarkia.co.uk |
| 19 | trademarkia.co.za |
| 20 | trademarkia.com |
| 21 | trademarkia.com.ar |
| 22 | trademarkia.com.cn |
| 23 | trademarkia.com.ng |
| 24 | trademarkia.com.ua |
| 25 | trademarkia.de |
| 26 | trademarkia.dk |
| 27 | trademarkia.ec |
| 28 | trademarkia.es |
| 29 | trademarkia.eu |
| 30 | trademarkia.fr |
| 31 | trademarkia.gr |
| 32 | trademarkia.gy |

INITIAL COMPLAINT
CASE NO.: 3:25-cv-7921

| 33 | trademarkia.hk |
|----|----------------|
| 34 | trademarkia.in |
| 35 | trademarkia.info |
| 36 | trademarkia.it |
| 37 | trademarkia.jp |
| 38 | trademarkia.kr |
| 40 | trademarkia.legal |
| 41 | trademarkia.mobi |
| 42 | trademarkia.mx |
| 43 | trademarkia.ng |
| 44 | trademarkia.nz |
| 45 | trademarkia.org |
| 46 | trademarkia.pe |
| 47 | trademarkia.pl |
| 48 | trademarkia.pt |
| 49 | trademarkia.ru |
| 50 | trademarkia.se |
| 51 | trademarkia.sg |
| 52 | trademarkia.tw |
| 53 | trademarkia.uk |

INITIAL COMPLAINT
CASE NO.: 3:25-cv-7921

| 54 | trademarkia.us |
|----|----------------|
| 55 | trademarkia.uy |

10. The TRADEMARKIA Marks and TRADEMARKIA domains are of material importance to Trademarkia. Trademarkia has used the TRADEMARKIA Marks and TRADEMARKIA domains continuously for over a decade and a half, and has invested significant time and funds towards promoting the same.

11. Because of the valuable goodwill that the TRADEMARKIA Marks represent, and their importance to the overall success of Trademarkia, Trademarkia aggressively protects the TRADEMARKIA Marks and the associated goodwill of the brand.

**THE PARTIES**

12. Plaintiff LegalForce RAPC Worldwide P.C. is a California S corporation having a principal place of business at 1580 W. El Camino Real, Suite 10, Mountain View, CA 94040. Plaintiff owns and operates the Trademarkia.com website. Plaintiff is a market leader in the field of trademark filing solutions, search solutions, trademark monitoring services, general legal information, and domain name registration services. It operates as a law firm, and is a registered ICANN registrar. Trademarkia provides these services online at set prices, making them readily available and affordable to small businesses and general consumers across the United States. Since introducing its website in September 2009, Trademarkia has grown to become the leading, nationally recognized trademark website for small businesses and consumers.

13. Defendant Squadhelp LLC is an Illinois limited liability company having a principal place of business at 2000 Center Dr, Suite East C221, Hoffman Estates, IL 60192. Defendant competes with Trademarkia in trademark filing, watch, and monitoring services. To gain competitive advantage over its competitors, and upon information and belief in particular Trademarkia, Defendant has intentionally and in bad faith sought ownership and previously purchased the unused domains Trademark.ai and Trademark.io, redirecting the domain traffic to

Tradeamark.io homepage, and infringing on the TRADEMARKIA Marks.

### JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 because this action arises under the laws of the United States, and because it involves allegations regarding federal trademark violations.

15. This Court has supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367 because it arises from the same nucleus of operative facts as the federal claims.

16. This Court has general personal jurisdiction over Defendant because Defendant has purposefully directed its business activities toward residents of California, including by soliciting, transacting with, and serving customers located in this State. Defendant has knowingly and successfully sold trademark-related services to California residents and continues to do so in competition with Plaintiff. Specifically, the Defendant confirmed on September 10, 2025, prior to filing this complaint that "[w]e do have customers in California and across the US who have successfully filed trademarks through our platform."

17. Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to the claims occurred in this District, and because Defendant conducts significant business in this District, upon information and belief. Specifically, Defendant admitted on September 10, 2025 that "[u]nlike platforms such as Trademarkia or LegalZoom, we provide a streamlined service focused on helping you register and manage your trademark efficiently." Such conduct demonstrates that Defendant has deliberately availed itself of the privileges of conducting business in California, and it should reasonably anticipate being brought before a court in this state.

**Trademarkia's Efforts to Secure Goodwill in the TRADEMARKIA Marks.**

18. Trademarkia was founded in 2009. The Trademarkia website, www.trademarkia.com, went live on or about September 15, 2009.

19. Since that time, Trademarkia has served approximately 70,000,000 (seventy million) visitors throughout the United States, and has assisted more than 100,000 (one-hundred thousand) small business owners in the search, monitoring, prosecution, and enforcement of

their trademark applications in more than 80 countries. In 2025 alone, Trademarkia customers placed over 6,000 orders on or through the website.

20. Trademarkia is cited as a trusted source for corporate history and branding in at least 700 Wikipedia pages for leading brands including Apple, Disney, Samsung, Coca Cola, PepsiCo, Tesla, Capgemini, Lenovo, Kmart, KFC, and hundreds of other iconic brands.

21. As a result of Trademarkia's efforts and expenditures, the TRADEMARKIA Marks have become widely recognized by the general public of the United States as a trusted leading news source for any new trademarks filed by celebrities, sports teams, musicians, politicians, or big corporations.

22. Almost from Trademarkia's inception, the TRADEMARKIA Marks have been featured and discussed in publications, on television programs, and on Internet websites all over the United States, including but not limited to, Bloomberg, FastCompany, New York Times, TechCrunch, FORBES, CNBC, TIME Magazine / Fortune, Wall Street Journal, Washington Post, and in the ABA Journal.

23. For nearly a decade, Trademarkia has advertised extensively over the Internet and other advertising channels throughout the country, including targeting large consumer markets such as Boston, New York, Chicago, San Francisco and Los Angeles.

24. The Trademarkia website generates hundreds of thousands of hits per week. The TRADEMARKIA Marks are prominently displayed on the Trademarkia.com and LegalForce.com webpages.

25. Trademarkia has achieved recognition for the TRADEMARKIA Marks through the following innovations:

    a. *Docketing system.* Trademarkia has aggregated trademark data from nearly a dozen countries and indexes tens of millions of trademarks daily for updates. It has become a "docketing system" for the world, enabling, for free, thousands of entrepreneurs to be kept up to date on deadlines for trademarks, oppositions, renewals and more. Previously, access to such tools were reserved for wealthy corporations with access to sophisticated tools from LexisNexis, Thomson Reuters, and others. Trademarkia has made these tools free to the world.

    b. *Search Technology.* Trademarkia has helped to answer the basic question that

many entrepreneurs have, which is "is my business name available to trademark", by making a knockout search from its databases of millions of trademarks, refreshed daily, freely accessible from its home page, through a search engine-like search box with little commercial advertising on its home page. As a result, Trademarkia now attracts over tens of millions of page views and over a million visitors to Trademarkia.com each year, making it one of the Internet's largest legal-oriented websites.

c. *Competitive and Breaking News.* Trademarkia automatically publishes free alerts regarding millions of trademarks in various countries making it a leading and primary news source for breaking business news whenever new products are soon to be released and whenever new marketing campaigns launch across the world.

d. *Catalog of American ingenuity and corporate history.* Trademarkia was the first to publicly index trademark data as old as the year 1872, making it a deep and rich repository of American history and corporate evolution. As a result, Trademarkia is cited as a trusted source for corporate history and branding in at least 750 Wikipedia pages for leading brands including Coca Cola, Budweiser, Kellogg, and hundreds of iconic brands.

e. *Innovative logo search engine.* Trademarkia has built what is the Internet's largest logo search engine based on design code identification of trademarks, spanning over 4 million logos that can be deeply searched by "what is inside" each logo for creative inspiration and brand development, free of charge. As a result, thousands of branding agencies and entrepreneurs use Trademarkia.com each month to find and discover new inspiration for their brands.

f. *Keeping trademark bullies accountable.* Trademarkia has built what is the Internet's first catalog of large company trademark bullies, hecklers, and their victims based on the number of trademarks they oppose, threaten to oppose, and are challenged by, through its annual rankings of those companies that actively overextend their trademark rights. This data is offered for free through automated annual rankings based on government data and published annually by Trademarkia.

g. *Reducing infringement of trademarks when registering domains.* Trademarkia has built the world's first domain registration service for small businesses that automatically checks for availability of trademark rights when registering domains, to assist in reducing cyber-piracy claims and reducing wasteful federal

litigation, free of charge.

h.  *Global automated trademark docketing reports.* Trademarkia has built automated and semi-automated trademark reports for most of the 100+ countries through which Trademarkia offers trademark filings. As a result, companies and entrepreneurs around the world can uniquely and centrally harmonize trademark portfolio management and access global trademark protection markets through a single website.

i.  *Trademark opposition window tracking.* Trademarkia has enabled small businesses to easily track their 30-day opposition window for trademarks filed with the USPTO in real time through its free opposition watch service. Prior to Trademarkia, such tools were reserved for rich corporations using expensive enterprise software by companies such as Thomson Reuters, Wolters Kluwer, and LexisNexis.

j.  *Bifurcated Supply Chain Management.* Trademarkia applied best manufacturing practices to legal services by taking all non-attorney work off of attorneys' plates and globalizing it to improve quality while reducing costs.

26. The TRADEMARKIA Marks were enormously recognized and distinctive at the time of Trademark.io's first infringing use in 2024, and continue to be to this day. Prior to Trademark.io's first use of the TRADEMARKIA Marks, thousands of social media posts and tweets on Facebook and Twitter mentioned the Trademarkia website in popular culture and media as the source for leading brand information.

27. Trademarkia had become a leading news indicator, often cited by major media and television as a source for breaking news prior to 2014 because it was the first to index USPTO's trademark records through static URLs and breadcrumb structures. Through this technique, Trademarkia transformed the status changes of trademark applications into breaking news across all markets.

28. Before the release of any major movie, book, or song, the owners typically secure trademark protection for the title to safeguard brand rights. Fans often follow new works connected to their favorite actors, studios, or franchises, making early knowledge of such filings inherently newsworthy. Trademarkia continuously monitors newly filed applications and automatically tracks status changes in real time. Because these trademark filings often reveal

upcoming projects, such as the title of the next *Star Wars*® installment, status updates can instantly become national or even international breaking news. As the first platform to disseminate this information to fans and the broader public, Trademarkia has established its marks as widely recognized and trusted sources of entertainment and brand-related news across the United States and internationally.

29. The TRADEMARKIA Marks achieved widespread recognition across the United States, and across many different industries and popular culture for many years before Trademark.io's first infringing use. Trademarkia has become and continues to be among the largest websites in the United States, having website traffic approaching some of the largest websites on the Internet by 2014, and has attracted millions of page views and unique visitors to the Trademarkia.com website in the years prior.

30. The TRADEMARKIA Marks are of material importance to Trademarkia. Trademarkia has used the TRADEMARKIA Marks continuously for over a decade and has spent a significant  amount of money and other resources promoting the same.

31. As a result of Trademarkia's exclusive, extensive, continuous, and worldwide use of the TRADEMARKIA Marks, the TRADEMARKIA Marks have come to signify Trademarkia as the leading provider of online trademark search, prosecution, and watch/monitoring services for small businesses and consumers, and have achieved such widespread public recognition that the use of the suffix "-markia" anywhere in all industries across the United States is now associated with Trademarkia.

32. As an industry leader, licensees of the Trademarkia platform have expended well over ten million dollars promoting the need for trademark search services, educating and raising awareness among consumers, and advertising and promoting the TRADEMARKIA Marks.

33. In order to build and maintain its status as the leading nationally-recognized brand, Trademarkia has promoted the TRADEMARKIA Marks through advertising across various media, including video, radio, and the Internet.

34. This lawsuit is necessitated by the fact that Defendant is seeking to trade on the TRADEMARKIA Marks' goodwill by registering and using the domain Trademark.ai and

Trademark.io. ("Disputed Domains") to advertise trademark filing, search, and monitoring services over the Internet.

35. Because of the goodwill that the TRADEMARKIA Marks represent, and its importance to the company, Trademarkia aggressively protects the TRADEMARKIA Marks.

36. Accordingly, Defendant must be ordered to stop its infringing activities, to pay damages to Trademarkia in an amount to be determined at trial, and to disgorge any profits it has made as a result of its willful and bad faith infringement of the TRADEMARKIA Marks.

37. As a direct result of Trademark.io infringing conduct, Trademarkia has suffered threatened injury given the fact that Trademark.io is directing Atom.com and Trademark.ai to Trademark.io's homepage. Specifically, Trademarkia has been threatened with harm because customers seeking services offered by Trademarkia, such as trademark watch services and trademark search services, have been misdirected to Trademark.io's homepage, which offers similar services.

**Defendant's infringement of Plaintiff's Trademark Rights**

38. On or about September 30, 2023, Defendant Squadhelp LLC purchased the domain name Trademarkia.io, as confirmed by historical name server records showing a transfer  to "squadhelp.com" from "afternic.com" on such date..

39. On or about August 14, 2025, Defendant publicly launched its competing service under the name Trademark.io through a press release on its website titled "Introducing Trademark.io — Brand Protection, Built for Founders." In that announcement, Defendant described Trademark.io as a nationwide and global platform for trademark searches, premium reports, trademark filings with attorney-led support, brand monitoring, and integration with naming agencies, legal platforms, and other marketplaces. Defendant expressly positioned Trademark.io as a streamlined alternative to existing providers, including Plaintiff, and promoted it as a solution to capture founders and small businesses "at the exact moment they're shaping their brand identity, when they're still open to inspiration." By this launch, Defendant not only admitted its entry into direct competition with Plaintiff in the trademark search, filing, and monitoring markets, but also confirmed its intent to solicit and serve customers seeking

trademark filing services, through an online platform indistinguishable in scope and reach from Plaintiff's well-established services on the Trademarkia.com website.

40. On or about August 15, 2025, i Dr. John Berryhill publicly noted on X.com: *'Looks like Atom is going to take on @Trademarkia with http://Trademark.io.'* This unsolicited observation by a third party underscores that the Defendant's use of the name Trademark.io created an immediate association with Plaintiff's well-established Trademarkia brand, evidencing likelihood of confusion between the TRADEMARKIA Marks and Trademark.io..

41. The significance of Dr. Berryhill's, immediate observation that Defendants' adoption of "Trademark.io" was an effort to "take on @Trademarkia" is heightened by the fact that Dr. Berryhill is not only a veteran of hundreds of UDRP proceedings and a widely recognized thought leader on domain name law, but is also a featured speaker at NamesCon Global 2025, the leading industry conference on domain branding and disputes. Dr. Berryhill has long represented major domain investors and registrars, and has established precedents in domain name jurisprudence. His independent criticism therefore carries particular weight: if a highly experienced and neutral domain industry authority immediately perceived "Trademark.io" as targeting Trademarkia, then ordinary consumers are even more likely to be confused. The recognition of this conflict by a leading NamesCon speaker further underscores Defendants' bad-faith intent and the willful nature of their infringement.

42. On or about August 17, 2025, the domain industry news site DomainGang.com published an article titled "Trademark service by Atom gets some nuclear changes," reporting problems with Defendant's launch of the Trademark.io service. The article stated that two prominent attorneys' profiles and images were displayed on the platform as if affiliated with Defendant's service, despite there being no explicit agreement for such affiliation, and that these images were promptly removed after the attorneys contacted Defendant. The article further noted that Defendant subsequently altered the branding of its trademark service from "Trademark.io" to "Trademark by Atom."  According to the article, one possible reason for the rebranding was that Dr. Berryhill observed that the presentation and branding of Defendant's service created a likelihood of confusion to the point of infringement against Plaintiff's

Trademarkia.com website.

43. On or about August 22, 2025, just days after industry observers had publicly criticized Defendant's launch of the "Trademark.io" service and noted that its branding created confusion with Plaintiff's TRADEMARKIA Marks, Defendant deepened its bad-faith conduct by purchasing the domain name Trademark.ai for approximately $39,000, as evidenced by a posting on the X platform by seller Marc Köhlbrugge.

44. This acquisition came only five days after the DomainGang.com article of August 17, 2025, reported that Defendant had falsely displayed the profiles of two attorneys as affiliated with its platform, and had quickly rebranded from "Trademark.io" to "Trademark by Atom" after Dr. Berryhill warned that the service's presentation created confusion amounting to infringement against Trademarkia. Rather than stepping back from its infringing behavior, Defendant escalated it by acquiring yet another domain, Trademark.ai, which contains the exact same letters as Plaintiff's mark with the "KIA" changed to "KAI", further cementing its intent to trade on Plaintiff's goodwill and exacerbate consumer confusion.

45. The Plaintiff's trademark is below :



46. On September 5, 2025, Dr. Berryhill, observing Defendant's activities, posted publicly on X.com: *'The learning curve continues at @atomHQ as they back away from "trademark.io" branding…'* To this post, Dr. Berryhill attached two versions of the Defendant's mark and how they modified them as shown below:

 

47. Defendants' use of the "Trademark.io" and "Trademark by Atom" logos is confusingly similar to Plaintiff's TRADEMARKIA marks. Both sets of marks prominently feature the identical dominant term "Trademark" in a modern, sans-serif font and a blue color scheme designed to convey professionalism and trust in the legal services industry. Plaintiff's TRADEMARKIA marks and Defendants' marks share the same overall commercial impression: a clean, technology-forward brand centered on the word "Trademark," with minor secondary elements such as "LegalForce," ".io," or "by atom" appearing in smaller or subordinate type. Defendants' addition of "by atom" after criticism does not dispel this similarity; instead, it confirms Defendants' awareness of the likelihood of confusion and constitutes a superficial modification that leaves the confusingly similar core presentation intact. As a result, ordinary consumers searching for trademark filing services are likely to believe that Defendants' services are affiliated with, sponsored by, or endorsed by Plaintiff.

48. Moreover, the change from "Trademark.io" to "Trademark by Atom" appears not as a genuine attempt to differentiate, but as a strategic move to deflect criticism while continuing to trade on Trademarkia's goodwill. Legally, this supports arguments of likelihood of confusion, willful infringement, and bad faith intent to profit under the Lanham Act and the Anticybersquatting Consumer Protection Act ("ACPA"). This superficial adjustment demonstrates Defendant's awareness that their original branding was improper, yet their choice to continue using the same domain and visual identity shows willful intent to persist in benefiting from confusion rather than cure it.

49. This comment and attachments reflect that Defendant's adoption of the 'Trademark.io' brand had drawn immediate criticism from a member of the public as infringing and confusingly similar to Plaintiff's TRADEMARKIA marks. Despite this criticism, Defendant persisted and subsequently acquired the domain Trademark.ai, further compounding their infringing activities.

50. Following the launch of Defendant's Trademark.io service and the subsequent removal of attorney profiles that were displayed without authorization, the only attorney profile visible

on the Trademark.io website as of September 16, 2025, was that of Randy Michels, co-founder of the Nashville law firm Trust Tree Legal, P.C.

51. On information and belief, Trust Tree serves as the primary law firm filing trademarks through the Trademark.io platform. This connection is significant because, in July 2025, three attorneys who had worked for Plaintiff joined Trust Tree: Spencer Keller (now Patent Group Chair), John Michael Miller (now Trademark Group Chair), and Derrick Davis (now Litigation Group Chair). Each of these attorneys acquired detailed knowledge of Plaintiff's trademark, patent, and litigation operations while employed by Plaintiff, and now hold leadership roles at Trust Tree, which appears to provide the same categories of services through Defendant's Trademark.io platform.

52. Upon information and belief, before hiring Mr. Keller, Mr. Miller, and Mr. Davis, Trust Tree Legal employed only three attorneys in total.  Thus, the hiring of Mr. Keller, Mr. Miller, and Mr. Davis effectively doubled the size of Trust Tree's attorney roster from three to six attorneys.

53. These actions are significant in the context of Plaintiff's claims because they show Defendant leveraging Plaintiff's former attorneys and their institutional knowledge in the same trade channels and business practices as Plaintiff, creating an appearance of continuity and legitimacy for Defendant's competing service. By combining confusingly similar domain names (e.g., Trademark.io and Trademark.ai) with the recruitment of Plaintiff's former attorneys and public alignment with their new law firm, Defendant has enhanced the likelihood of consumer confusion, supporting a claim of false designation of origin under 15 U.S.C. § 1125(a), and underscored its bad faith intent to trade on Plaintiff's goodwill in violation of both the Lanham Act and the Anticybersquatting Consumer Protection Act.

**Likelihood of Confusion between Plaintiff's Marks and Defendant's Marks**

54. Defendant's use of the names Trademark.io and Trademark.ai creates a substantial likelihood of confusion with Plaintiff's incontestable TRADEMARKIA marks. Plaintiff's TRADEMARKIA marks are strong, incontestable, and widely recognized as designating Plaintiff's legal technology platform for trademark search, filing, monitoring, and brand

protection services. Defendant has entered the very same marketplace, offering virtually identical services to the same class of consumers, entrepreneurs, small businesses, and founders seeking trademark protection.

**Defendant's Bad Faith Intent and Sophistication in Branding and Trademarks**

55. Upon information and belief, Defendant Atom.com and its Chief Executive Officer, Darpan Munjal, acted willfully and in bad faith in registering, acquiring, and using domain names confusingly similar to Plaintiff's incontestable TRADEMARKIA marks. Mr. Munjal is an experienced business executive with decades of work in eCommerce, branding, and trademarks, holding an MBA in marketing and entrepreneurship. Atom.com, under his direction, markets itself as the "*We are the world's leading crowdsourced naming platform. Atom (formerly Squadhelp) has helped more than 50,000 customers — from early-stage startups to world-leading brands like Nestlé, Dell, Pepsi, Hilton, Alibaba, and many more*" claims expertise in trademarks and brand identity, and operates a marketplace of hundreds of thousands of "brandable" domains for sale. By positioning itself as an authority on naming and trademarks, Atom.com cannot credibly claim ignorance of Plaintiff's longstanding rights or the confusion caused by its deliberate use of Trademark.io and Trademark.ai.

56. At the 2021 NamesCon conference, Defendant Atom's Chief Executive Officer, Darpan Munjal, admitted during an interview on Youtube that Defendant actively promotes brandable domains through advertising and personalized recommendations to maximize sales. This public appearance underscores that Munjal was not only participating in but also being presented as a thought leader within the global domain investment community. By placing himself in this position, Munjal acknowledged his expertise in the field of acquiring, marketing, and leveraging domain names for commercial advantage. This context is significant because it establishes that Defendant is a sophisticated actors who were deeply engaged in the domain marketplace years before registering and using the confusingly similar domains Trademark.io and Trademark.ai, and therefore could not have innocently adopted them without knowledge of Plaintiff's established TRADEMARKIA mark.

57. Specifically, at the 2021 NamesCon conference, Defendant Atom's Chief Executive

Officer, Darpan Munjal, described his company Squadhelp as "*a naming platform*" that "*help[s] companies come up with names for their businesses*," explaining that it is "*built on a crowdsourcing mode*l" but applies *"a lot of data and AI and all those things into helping companies discover great names.*" Munjal further stated that in recent years Squadhelp had been "*ramping up our marketplace which is primarily focusing on brandable domains*," and that the company's "*main focus has been solving this problem of discovery*," because "*the hardest, the most difficult problem…is helping companies discover the names that they're interested in."* He emphasized the use of data, AI, remarketing, and personalization to capture consumer interest in domain names, noting that Squadhelp "*capture[s] a lot of data on what names they were interested in,*" that the site experience is tailored accordingly, and that notifications are sent when names are repriced or discounted. Munjal admitted that Squadhelp actively promotes brandable domains through advertising and personalized recommendations to maximize sales.

58. Defendant Squadhelp's Chief Executive Officer, Darpan Munjal, has positioned himself as a recognized expert in the domain-name industry by speaking at NamesCon, a leading international conference devoted to domain branding and monetization. At NamesCon, Munjal described Squadhelp's business model as focused on "brandable domains," emphasizing the use of data, AI, and remarketing tools to identify, acquire, and promote names that are "prestigious," "memorable," and capable of generating consumer trust. Munjal's public role as a thought leader in this space demonstrates that Defendants are highly sophisticated actors with a deep understanding of the commercial value of domain names. This makes clear that Defendants' registration and use of confusingly similar domains such as Trademark.io and Trademark.ai was not inadvertent, but rather a deliberate act consistent with the business strategy Munjal himself articulated. These facts strongly support a finding of willful infringement under the Lanham Act and bad-faith intent to profit under the Anticybersquatting Consumer Protection Act.

59. Darpan Munjal, Founder & CEO of Atom.com, is again listed as a speaker at NamesCon Global 2025, after previously speaking at NamesCon in 2021 (alongside Dr. Berryhill). This repeat speaker status underscores his continued prominence and influence in the domain-name branding and marketplace industry. It demonstrates that Munjal remains a recognized thought

leader in selecting, marketing, and monetizing "brandable domains." Such repeated public appearances reinforce that he is well aware of industry norms, branding risks, and the value of domain name identity. In turn, this supports the inference that Defendants' registration and usage of the confusingly similar domains Trademark.io and Trademark.ai were not matters of ignorance but deliberate actions by a knowledgeable actor.

60. These remarks demonstrate that Defendant is a sophisticated domain investors and sellers who specialize in identifying, acquiring, and monetizing "brandable domains" to capture consumer trust. Defendant's later registration and use of the domains Trademark.io and Trademark.ai, confusingly similar to Plaintiff's incontestable TRADEMARKIA mark, are consistent with the deliberate business model Darpan Munjal publicly described at NamesCon, and confirm that Defendant acted with knowledge and a bad-faith intent to profit from Plaintiff's goodwill in violation of the Lanham Act and the Anticybersquatting Consumer Protection Act.

61. On or about April 9, 2025, Defendant Atom's Chief Executive Officer, Darpan Munjal, further publicly stated on Instagram: "*What is the one thing that can truly differentiate you from others. What's the first touch point that people have with your company? That's your brand, right? And if you have a brand that can truly resonate with those audience, that can truly build a story, that can truly set a promise about what you deliver, what you what you're all about, that makes a lot of difference in the term brand is memorable, if that brand is unique, the people will think of that name themselves. Come back to you next time on their own, there's a lot of aspect of word of mouth, so having a strong brand name really is the foundation. That's what the main shift is about. Companies want to differentiate themselves. They want to position themselves as the leader. And that's where a lot of companies are going, after some of these prestigious brand names that they can call themselves, so that when people work with them or think about a service or product, that brand instills immediate trust, and that gives them a reason to come to that domain.*"

62. Darpan Munjal's remarks are not an abstract discussion of branding, but a direct acknowledgment of the commercial strategy Defendant employs: acquiring or adopting brand

names and domain names that immediately convey trust and recognition, so that consumers will associate them with leadership in a market and return to them automatically. This statement is highly significant because it mirrors Defendant's conduct in registering and launching Trademark.io and later acquiring Trademark.ai - domains that differ from Plaintiff's incontestable TRADEMARKIA mark only by slight letter variations. In other words, Defendant intentionally selected domains that appear "prestigious" and "memorable" precisely because they mimic and trade on the goodwill Plaintiff has cultivated in its brand for more than a decade.

63. By virtue of this background, Defendant cannot credibly claim to be naïve actors or innocent infringers. Their core business revolves around branding, naming, trademarks, and domain sales. Defendants are well aware of the significance of trademarks in commerce, and of the importance of avoiding confusion in the marketplace.

64. Despite this sophistication, Defendant intentionally adopted and used domain names Trademark.io and Trademark.ai, which are nearly identical to Plaintiff's TRADEMARKIA marks, to promote directly competing services. Defendant did so after industry experts publicly criticized their initial branding as confusingly similar to Plaintiff's marks, further evidencing actual knowledge and intent.

65. Defendant compounded this conduct by associating their platform with attorneys who formerly worked for Plaintiff, thereby enhancing the appearance of affiliation or continuity and increasing the likelihood of consumer confusion.

66. Defendant's use of the confusingly similar domains Trademark.io and Trademark.ai has also caused measurable harm to Plaintiff through search engine diversion. Consumers who search for Plaintiff's well-established TRADEMARKIA brand on Google or other search platforms are presented with results that include Defendant's domains. Because of the near identity between "Trademarkia" and "Trademark.io" or "Trademark.ai," consumers are likely to click on Defendant's websites under the mistaken belief that they are affiliated with or authorized by Plaintiff. Each such diverted click represents a lost opportunity for Plaintiff to capture that consumer's attention, build a relationship, and secure their business.

67. Even when some consumers eventually recognize that Defendant's services are not those of Trademarkia, the initial diversion itself causes harm by depriving Plaintiff of the chance to convert those leads into paying clients. In the highly competitive market for trademark and legal services, the value of each lead is significant. The intentional diversion of traffic by Defendant results not only in lost sales but also in long-term harm to Plaintiff's goodwill and brand equity, as consumers associate confusion and misdirection with Plaintiff's mark. This form of marketplace injury-lost leads, lost conversions, and reputational dilution-is a direct consequence of Defendant's infringing use of confusingly similar domains and further demonstrates irreparable harm warranting injunctive relief.

68. These facts demonstrate that Defendant's conduct was undertaken with a bad faith intent to profit from Plaintiff's established goodwill, in violation of the Lanham Act and the Anticybersquatting Consumer Protection Act. Such willful and deliberate infringement supports an award of treble damages, statutory damages, and attorneys' fees.

**Defendant's Bad Faith Under the ACPA**

69. The following non-exhaustive factors, identified in 15 U.S.C. § 1125(d)(1)(B)(i), confirm that Defendant acted with bad-faith intent to profit from Plaintiff's TRADEMARKIA mark:

70. (I) Trademark Rights of the Plaintiff.  Plaintiff owns incontestable federal registrations for the TRADEMARKIA mark, and has used the mark continuously since 2009 in connection with trademark filing and legal services.

71. (II) Defendant's Lack of Rights or Legitimate Interests.  Defendant have never been commonly known as "Trademarkia," "Trademark.io," or "Trademark.ai," nor are they authorized to use Plaintiff's mark in any manner.

72. (III) Defendant's Prior Use in Connection with Bona Fide Offerings.  Defendant did not use the domains Trademark.io or Trademark.ai in connection with any bona fide business prior to Plaintiff's adoption and widespread recognition of the TRADEMARKIA mark. Their adoption came more than a decade later, and only to divert Plaintiff's goodwill.

73. (IV) Defendant's Noncommercial or Fair Use.  Defendant are not engaged in any

legitimate noncommercial or fair use. To the contrary, their use is purely commercial and directly competitive with Plaintiff's business.

74. (V) Intent to Divert Consumers.  By registering and operating Trademark.io and Trademark.ai, Defendant intended to divert consumers searching for "Trademarkia" to Defendant's own platforms. This diversion causes confusion as to source, affiliation, or sponsorship, harms Plaintiff's goodwill, and deprives Plaintiff of leads and conversions.

75. (VI) Offer to Sell the Domain Name.  Defendant's acquisition of the Trademark.ai domain for $39,000 demonstrates their recognition of the commercial value of adopting a domain confusingly similar to Plaintiff's mark, and underscores their intent to profit from such value.

76. (VII) Providing Misleading Contact Information.  Defendant's acquired and registered the infringing domains through their Atom.com/Squadhelp marketplace platform in a manner designed to obscure the nature and extent of their involvement which includes masking WHOIS information as private, and misrepresented their use of affiliated attorneys to consumers.

77. (VIII) Registration of Multiple Infringing Domains.  Defendant's registered and used multiple infringing domains - Trademark.io and Trademark.ai - in close succession, demonstrating a pattern of conduct targeting Plaintiff's brand.

78. (IX) Distinctiveness and Fame of Plaintiff's Mark.  Plaintiff's TRADEMARKIA mark is distinctive, incontestable, and well known in the legal technology industry, with millions of users and widespread media coverage. Defendant were fully aware of Plaintiff's mark, and in fact pivoted their branding only after public criticism of their initial launch.

79. Taken together, these statutory factors overwhelmingly establish that Defendant registered and used Trademark.io and Trademark.ai with bad-faith intent to profit from Plaintiff's goodwill in violation of the Anticybersquatting Consumer Protection Act.

**Reservation of Rights Regarding Trust Tree**

80. Plaintiff alleges on information and belief that attorneys now affiliated with Trust Tree Legal, P.C. ("Trust Tree") including former employed attorneys of Plaintiff-had access to confidential and proprietary know-how, client intake methods, docketing systems, and other

non-public information while employed at or affiliated with Plaintiff. Plaintiff further alleges that Trust Tree and its attorneys may be using or benefiting from such information in connection with Defendant's infringing activities, including through their appearance on or association with the Trademark.io and Trademark.ai platforms.

81. Plaintiff expressly reserves the right to amend this Complaint to add Trust Tree Legal, P.C. and/or individual attorneys as defendants should discovery confirm their direct role in the infringing conduct alleged herein. Plaintiff further reserves the right to assert additional causes of action, including but not limited to misappropriation of trade secrets under federal and state law and breach of duty of loyalty, arising from the use or disclosure of confidential and proprietary information obtained while these attorneys were employed by Plaintiff.

### FIRST CLAIM FOR RELIEF
### TRADEMARK INFRINGEMENT
### 15 U.S.C. § 1114

82. Trademarkia repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth herein.

83. Plaintiff is the owner of valid, subsisting, and incontestable federal trademark registrations for the TRADEMARKIA marks, including Reg. Nos. 3,965,290 and 5,642,937. These registrations are in full force and effect and constitute prima facie evidence of Plaintiff's exclusive right to use the marks in commerce in connection with the services identified therein.

84. Plaintiff operates the trademarkia.com website, through which it offers online trademark search, filing, monitoring, renewal, and related brand-protection services to customers nationwide.

85. Defendant markets competing trademark services under the names "Trademark.io" and "Trademark.ai."

86. When encountered by ordinary purchasers, Trademarkia, Trademark.io, and Trademark.ai create a highly similar overall commercial impression: each begins with the identical, dominant term "Trademark," followed by a short two-letter ending comprised of the vowel letters i, a, or o. Viewed in advertising, search results, browser address bars, or on mobile devices, the names are visually and phonetically close and are easily confused as the same

brand, a sub-brand, or a line extension of Plaintiff.

87. The parties sell the same types of services to the same customers through the same trade channels, principally over the Internet, by soliciting and onboarding clients online and arranging for trademark applications to be filed in the United States.

88. As of September 16, 2025, the only attorney profile displayed on Defendant's website is Randy Michels, a co-founder of the Nashville law firm Trust Tree Legal, P.C.. Upon information and belief, Trust Tree is the primary firm providing filing services through Defendant's platform.

89. In July 2025, three attorneys who worked for Plaintiff joined Trust Tree and now hold leadership roles there: Spencer Keller (Patent Group Chair), John Michael Miller (Trademark Group Chair), and Derrick Davis (Litigation Group Chair).

90. These individuals gained detailed, non-public knowledge of Plaintiff's trademark, patent, and litigation operations while employed by Plaintiff, and now perform substantially similar functions at Trust Tree. The public association of Trust Tree (and Mr. Michels) with Defendant's platform, combined with the closely similar names Trademarkia / Trademark.io / Trademark.ai, is likely to lead consumers to believe mistakenly that Defendant's services originate with, are affiliated with, endorsed by, or are a continuation of Plaintiff's services.

91. As a result of the similarity of the names, the overlap in services and channels, and the public association with Plaintiff's former attorneys, there is a likelihood of confusion as to source, sponsorship, affiliation, and approval, and a risk of false designation of origin in the marketplace.

92. Defendant's infringing activities have caused, and unless enjoined by this Court, will continue to cause, irreparable harm to Plaintiff's business, reputation, and goodwill. Plaintiff has no adequate remedy at law for these injuries.

93. Defendant's acts of infringement have been committed knowingly, willfully, and deliberately. Plaintiff is therefore entitled to recover Defendant's profits, Plaintiff's actual damages, treble damages, statutory damages, costs, and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1114 and 1117.

**SECOND CLAIM FOR RELIEF**

TRADEMARK INFRINGEMENT
15 U.S.C. § 1125(a)

94. Trademarkia repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth herein.

95. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits the use in commerce of any word, term, name, or device, or any false designation of origin, false or misleading description, or false or misleading representation of fact, which is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

96. Plaintiff operates under the TRADEMARKIA marks and has built substantial goodwill and reputation in those marks through continuous use since 2009. Plaintiff's marks are widely recognized as identifying Plaintiff as the source of trademark search, filing, monitoring, renewal, and related brand-protection services.

97. Defendant has used and continues to use the names "Trademark.io" and "Trademark.ai" in commerce in connection with directly competing trademark services, including search, filing, monitoring, and brand protection.

98. Defendant's use of these names in connection with identical services is likely to cause consumers to believe, incorrectly, that Defendant's services are affiliated with, endorsed by, sponsored by, or otherwise connected with Plaintiff.

99. When viewed in advertising, online search results, or browser address bars, Defendant's names create a confusingly similar commercial impression to Plaintiff's Trademarkia marks. Each begins with the identical dominant element "Trademark" and ends with a short suffix using the letters i, a, or o, creating a nearly indistinguishable appearance and sound.

100.    Defendant has reinforced this false impression by publicly associating its platform with the Nashville-based law firm Trust Tree Legal, P.C., prominently featuring its co-founder, Randy Michels, on the Trademark.io homepage as of September 16, 2025. Trust Tree employed three attorneys, Spencer Keller, John Michael Miller, and Derrick Davis who previously worked for Plaintiff on Trademarkia matters and are now performing parallel roles as chairs of patent,

trademark, and litigation groups.

101.    By adopting names that are confusingly similar to Plaintiff's marks, using them in the same trade channels to sell identical services, and associating with attorneys who previously worked for Plaintiff, Defendant has created a false designation of origin and a false and misleading representation of fact as to the source, sponsorship, affiliation, and approval of its services.

102.    Defendant's acts constitute trademark infringement, false designation of origin, and unfair competition under 15 U.S.C. § 1125(a).

103.    Defendant's unlawful acts have caused, and unless restrained will continue to cause, irreparable harm to Plaintiff's business, reputation, and goodwill, for which Plaintiff has no adequate remedy at law.

104.    Defendant's acts were and are willful, knowing, and intentional. Plaintiff is therefore entitled to an award of Defendant's profits, Plaintiff's damages, enhanced damages, statutory damages, costs, and reasonable attorney's fees under 15 U.S.C. §§ 1125(a) and 1117.

105.    If Defendant's infringement is permitted to continue, the Plaintiff faces the risk of irreparable harm. The Plaintiff's remedy at law is not by itself adequate to remedy Defendant's actions, and irreparable harm suffered by Trademarkia will continue unless this Court enjoins Defendant. Trademarkia therefore is entitled to injunctive relief pursuant to 15 U.S.C. § 1116.

### THIRD CLAIM FOR RELIEF
CYBERPIRACY IN VIOLATION OF
15 U.S.C.A. § 1125(D)(1) AGAINST TRADEMARK.IO AND TRADEMARK.AI

106.    Trademarkia repeats each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though fully set forth herein.

107.    Plaintiff owns valid, subsisting, and incontestable federal trademark registrations for the TRADEMARKIA marks. Plaintiff's marks are distinctive and have acquired substantial goodwill through continuous use since 2009 in connection with trademark search, filing, monitoring, and brand-protection services.

108.    Trademark.io.  Defendant registered and used the domain name Trademark.io in bad faith and with the intent to profit from Plaintiff's TRADEMARKIA marks. At launch,

Defendant's "Trademark.io" service displayed the entirety of the name TRADEMARK.IO on the upper left that were visually similar to Plaintiff's Trademarkia brand, creating the impression of affiliation or origin. On or about August 17, 2025, intellectual property attorney Dr. John Berryhill publicly noted that the "Trademark.io" branding created confusion amounting to infringement of Plaintiff's marks. Only after this criticism did Defendant alter its presentation to "Trademark by Atom," evidencing its knowledge of Plaintiff's rights and intent to take advantage of the goodwill in the TRADEMARKIA marks. At the same time, Defendant removed the unauthorized profiles of two attorneys it had displayed on the site, replacing them with an attorney whose firm had hired three of the Plaintiff's attorneys with intimate knowledge of the Plaintiff's operation. Defendant's decision to continue operating under the name Trademark.io after being put on notice of confusion, while simultaneously associating themselves with a firm  in which Plaintiff's former attorney just joined, demonstrates bad faith intent to exploit Plaintiff's marks in violation of the Anticybersquatting Consumer Protection Act.

109.    Defendant further demonstrated bad faith by acquiring and using the domain name Trademark.ai. On or about August 22, 2025, Defendant purchased the domain for approximately $39,000 from a seller who publicly advertised the sale through Defendant's own Atom.com platform, which markets domain names, including those that incorporate or infringe the marks of others. The Trademark.ai website resolves to a landing page offering users the ability to "Find and analyze trademark availability with AI-powered insights," and expressly states at the bottom: "Data provided by Trademark.io." Thus, Defendant is using Trademark.ai to redirect Internet traffic and consumer attention to its Trademark.io platform. By acquiring a domain comprised of the identical letters of Plaintiff's TRADEMARKIA mark, merely changing "KIA," to "KAI" and using it to funnel users toward its competing services, Defendant has acted with bad faith intent to profit from Plaintiff's goodwill. Defendant's conduct, together with its operation of Atom.com to facilitate the sale and repurchase of infringing domains, establishes that Defendant and Atom.com are engaged in cybersquatting, or at a minimum contributing to cybersquatting, in violation of 15 U.S.C. § 1125(d)(1).

110. Defendant has purchased, trafficked in, and used the domain names Trademark.io and Trademark.ai, which are confusingly similar to and, in the case of Trademark.ai, nearly identical to Plaintiff's TRADEMARKIA marks. Each domain name incorporates the dominant element "Trademark" and makes only minor alterations in lettering, thereby creating a virtually indistinguishable commercial impression with Plaintiff's mark.

111. Upon information and belief, Defendant acquired the domain Trademarkia.io on or about September 30, 2023, and Trademark.ai on or about August 22, 2025, for approximately $39,000, as evidenced by a posting on the X platform by the seller, Marc Köhlbrugge.

112. Defendant has used these domains to advertise and promote services that directly compete with Plaintiff, including trademark search, filing, and monitoring. Defendant's conduct is designed to divert Internet users seeking Plaintiff's services to Defendant's competing platform.

113. Defendant registered and used these domains with a bad faith intent to profit from Plaintiff's TRADEMARKIA marks. Among the factors evidencing Defendant's bad faith are:

a. Defendant's use of confusingly similar domains to sell identical services in the same trade channels as Plaintiff.

b. Defendant's public association with Trust Tree Legal, P.C., a firm that, in July 2025, hired away three of Plaintiff's attorneys--Spencer Keller, John Michael Miller, and Derrick Davis--who now hold leadership roles and possess knowledge of Plaintiff's operations.

c. Defendant's prominent display of Trust Tree co-founder Randy Michels on its Trademark.io homepage, reinforcing the impression of continuity or affiliation with Plaintiff.

d. Defendant's purchase of Trademark.ai only days after industry observers publicly raised concerns that Defendant's "Trademark.io" branding created confusion and possible infringement of Plaintiff's TRADEMARKIA marks.

e. Defendant's willful decision to continue using confusingly similar names despite being on notice of Plaintiff's rights.

114. Defendant's conduct constitutes cyberpiracy in violation of 15 U.S.C. § 1125(d)(1).

115.    Defendant's unlawful acts have caused, and unless restrained will continue to cause, irreparable harm to Plaintiff's business, reputation, and goodwill, for which Plaintiff has no adequate remedy at law.

116.    Defendant's acts were and are willful, knowing, and intentional. Pursuant to 15 U.S.C. § 1117(d), Plaintiff is entitled to elect, at any time before final judgment, to recover statutory damages of up to $100,000 for each of the Trademark.ai and Trademark.io domains, in addition to or instead of Defendant's profits, Plaintiff's damages, costs, and reasonable attorney's fees.

### FOURTH CLAIM FOR RELIEF
### CYBERPIRACY AGAINST ATOM.COM

117.    Trademarkia repeats each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though fully set forth herein.

118.    Plaintiff owns valid, subsisting, and incontestable federal trademark registrations for the TRADEMARKIA marks, which are distinctive and have acquired substantial goodwill through continuous use since 2009.

119.    Defendant Atom.com operates an online platform that, upon information and belief, actively markets, facilitates, and consummates the sale of Internet domain names, including domains that are identical or confusingly similar to Plaintiff's marks.

120.    On or about August 22, 2025, the domain name Trademark.ai, which is confusingly similar to Plaintiff's TRADEMARKIA marks, was marketed and sold through Atom.com's platform to Squadhelp LLC. The seller of Trademark.ai publicly advertised the transaction through Atom.com, and the domain was re-acquired into Defendant's control.

121.    The Trademark.ai domain is now used to host a landing page stating "Find and analyze trademark availability with AI-powered insights," and at the bottom of the page it displays: "Data provided by Trademark.io." This page operates as a funnel, redirecting consumer attention and Internet traffic to Defendant's competing Trademark.io platform.

122.    By marketing, facilitating, and profiting from the sale and transfer of the Trademark.ai domain, Atom.com has "trafficked in" a domain name that is confusingly similar to Plaintiff's mark, with a bad-faith intent to profit from Plaintiff's goodwill, in violation of 15

U.S.C. § 1125(d)(1).

123.    Atom.com is not a passive registrar. Upon information and belief, Atom.com directly participated in the transaction for Trademark.ai, promoted the domain through its platform, and reintroduced it into the control of Squadhelp LLC for the purpose of redirecting consumer traffic to the infringing Trademark.io service.

124.    Plaintiff has been and continues to be harmed by Atom.com's conduct. Plaintiff has suffered and will continue to suffer irreparable harm to its business, reputation, and goodwill for which there is no adequate remedy at law.

125.    Plaintiff is entitled to recover, at its election, either (a) Atom.com's profits and Plaintiff's actual damages, or (b) statutory damages in an amount up to $100,000 for the Atom.com domain name, as provided in 15 U.S.C. § 1117(d). (c) That Atom.com be ordered to disgorge any profits from the transaction of the $39,000 listing, purchase, and transfer of the Trademark.ai domain name onto itself, together with any additional profits realized from trafficking in domains confusingly similar to Plaintiff's marks.

126.    Plaintiff is further entitled to an order directing the forfeiture, cancellation, or transfer of the domain name Trademark.ai to Plaintiff, and to permanent injunctive relief barring Atom.com from marketing or facilitating the sale of domain names that are identical or confusingly similar to Plaintiff's marks in the future.

**FIFTH CLAIM FOR RELIEF**
TRADEMARK INFRINGEMENT
CALIFORNIA COMMON LAW

127.    Trademarkia repeats each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though fully set forth herein.

128.    Trademarkia is the sole and exclusive owner of the trademark rights in the TRADEMARKIA Marks.

129.    Trademarkia has priority of use in commerce for the TRADEMARKIA Marks over Defendant.

130.    Plaintiff is the owner of the TRADEMARKIA marks, which have been used continuously in commerce since at least September 2009 in connection with trademark search,

filing, monitoring, renewal, and brand-protection services.

131.    Through extensive and continuous use, advertising, promotion, and sales, Plaintiff's TRADEMARKIA marks have acquired substantial goodwill and distinctiveness in the minds of consumers in California and throughout the United States, signifying Plaintiff as the sole source of the services offered under the marks.

132.    Defendant has marketed, promoted, and offered trademark services under the confusingly similar names "Trademark.io" and "Trademark.ai."

133.    Defendant's use of Trademark.io and Trademark.ai in connection with competing services is likely to cause confusion, mistake, or deception among consumers in California as to the affiliation, connection, or association of Defendant with Plaintiff, or as to the origin, sponsorship, or approval of Defendant's services by Plaintiff.

134.    Defendant's conduct has caused and is likely to continue causing consumers in California to believe mistakenly that Defendant's services are affiliated with or endorsed by Plaintiff, thereby infringing upon Plaintiff's common law rights in the TRADEMARKIA marks.

135.    Defendant's infringement of Plaintiff's common law trademark rights has caused and, unless enjoined, will continue to cause irreparable harm to Plaintiff's business, reputation, and goodwill, for which Plaintiff has no adequate remedy at law.

136.    Defendant's acts were and are willful, knowing, and intentional, entitling Plaintiff to an award of compensatory damages, punitive damages, costs, and attorneys' fees under California law.

**SIXTH CLAIM FOR RELIEF**
**CALIFORNIA UNFAIR COMPETITION, CAL. BUS. & PROF. CODE § 17200, ET SEQ.**

137.    Trademarkia repeats each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though fully set forth herein.

138.    California Business & Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice.

139.    Defendant's conduct, including but not limited to (a) use of the confusingly similar names Trademark.io and Trademark.ai to market competing services, (b) registration, use, and trafficking in domains confusingly similar to Plaintiff's TRADEMARKIA marks, (c) public

association with attorneys who formerly worked for Plaintiff and who possess non-public knowledge of Plaintiff's business operations, and (d) misrepresentations and omissions in connection with the promotion of their trademark services, constitutes unlawful, unfair, and fraudulent business practices under California law.

140.    Defendant's acts are unlawful because they violate the Lanham Act, 15 U.S.C. §§ 1114 and 1125, California common law governing trademark infringement, and the Anticybersquatting Consumer Protection Act.

141.    As a direct and proximate result of Defendant's unfair competition, Plaintiff has suffered and will continue to suffer harm to its goodwill, reputation, and business, as well as diversion of sales and loss of prospective customers.

142.    Plaintiff seeks restitution, disgorgement of all profits wrongfully obtained by Defendant through their unfair competition, and injunctive relief prohibiting Defendant from continuing to engage in such unlawful, unfair, or fraudulent business acts or practices.

**REQUEST FOR RELIEF**

143.    WHEREFORE, Plaintiff LegalForce RAPC Worldwide P.C. d/b/a Trademarkia respectfully prays for judgment against Defendant Squadhelp LLC (d/b/a "Trademark.io" and "Atom.com"), and for the following relief:

144.    **Preliminary and Permanent Injunctions** (15 U.S.C. § 1116; Cal. Bus. & Prof. Code § 17203) enjoining Defendant, and their officers, agents, servants, employees, attorneys, affiliates, successors, assigns, and all persons in active concert or participation with them, from:

a.  using TRADEMARKIA or any reproduction, counterfeit, copy, colorable imitation, or confusingly similar designation (including Trademark.io and Trademark.ai) in connection with trademark-related services;

b.  making any false or misleading statements or designations of origin that suggest sponsorship, affiliation, approval, or association with Plaintiff;

c.  registering, trafficking in, selling, transferring, licensing, or using any domain name that is identical or confusingly similar to the TRADEMARKIA marks;

d.  soliciting, inducing, or using Plaintiff's confidential, proprietary, or trade secret

information obtained through former employees or agents.

145. **Domain Name Remedies** (15 U.S.C. § 1125(d)(1)(C)): an order directing the forfeiture, cancellation, and/or transfer to Plaintiff of the domain names Trademark.io, Trademark.ai, and any other domain names owned, controlled, or used by Defendant that are identical or confusingly similar to the TRADEMARKIA marks; including registrar-level "lock" and hold directives to prevent transfer during the pendency of this action.

146. **Corrective Measures & Compliance Reporting:**

a. Corrective advertising and website/app notices approved by the Court clarifying that Defendant are not affiliated with Plaintiff;

b. Destruction or permanent deletion of infringing branding, marketing materials, advertisements, web pages, and metadata bearing confusingly similar designations;

c. Within thirty (30) days after entry of injunctive relief, a sworn compliance report detailing, with specificity, the steps taken to comply with the Court's order.

147. **Accounting and Disgorgement** (15 U.S.C. § 1117(a); Cal. common law; § 17203): an accounting of all gains, profits, and advantages derived by Defendant from the acts complained of, and disgorgement of those profits to Plaintiff.

148. Monetary Relief for Federal Trademark Infringement and False Designation (15 U.S.C. §§ 1114, 1125(a), 1117(a)):

a. (Plaintiff's actual damages (including lost profits, harm to goodwill, diversion of sales, and loss of prospective customers);

b. Defendant's profits attributable to the infringement and unfair competition;

c. Treble damages or enhanced damages for willful infringement as permitted by law.

149. Monetary Relief for Cyberpiracy (15 U.S.C. § 1117(d)): at Plaintiff's election prior to final judgment, statutory damages of up to $100,000 per domain name for violations of 15 U.S.C. § 1125(d)(1) (including Trademark.io and Trademark.ai), or Plaintiff's actual damages and Defendant's profits.

150. **Atom.com-Specific Relief (Cybersquatting/Trafficking):**

a. Disgorgement of any profits from the $39,000 obtained or facilitated in connection with

the listing, sale, and transfer of Trademark.ai, together with any additional profits realized from trafficking in domains confusingly similar to the TRADEMARKIA marks;

b. Permanent injunction prohibiting Atom.com from marketing, selling, facilitating, or trafficking in domain names identical or confusingly similar to TRADEMARKIA.

151. **California Common Law & UCL Remedies:**

a. Compensatory damages for common law trademark infringement;

b. Punitive damages for willful and malicious misconduct under California common law;

c. Restitution and disgorgement under Cal. Bus. & Prof. Code § 17200, et seq.;

d. Injunctive relief under § 17203 barring unlawful, unfair, or fraudulent practices.

152. **Declaratory Relief:** a declaration that Defendant's use of Trademark.io and Trademark.ai (and any confusingly similar designations) infringes Plaintiff's TRADEMARKIA marks, constitutes false designation of origin, and violates the ACPA and California law.

153. Pre- and Post-Judgment Interest at the maximum rates permitted by law, accruing from the earliest date allowed.

154. **Costs and Attorneys' Fees** (15 U.S.C. § 1117(a) & (b); Cal. law where applicable), including expert fees as permitted, on the ground that this is an exceptional case.

155. Constructive Trust over all monies and proceeds traceable to Defendant's unlawful conduct.

156. Such other and further legal and equitable relief as the Court deems just and proper to fully remedy and deter the wrongful conduct described herein.

Respectfully submitted this Wednesday September 17, 2025.

LEGALFORCE RAPC WORLDWIDE, P.C.
By   /s/ Raj V. Abhyanker
Raj V. Abhyanker
California State Bar No. 233,284
Attorney for Plaintiff:
LegalForce RAPC Worldwide, P.C.

1

**JURY  TRIAL REQUESTED**

2

3

Plaintiff hereby requests a jury trial on all issues so triable in this matter.

4

5

Respectfully submitted this Wednesday, September 17, 2025.

6

LEGALFORCE RAPC WORLDWIDE, P.C.

7

By   /s/ Raj V. Abhyanker
Raj V. Abhyanker
California State Bar No. 233,284
Attorney for Plaintiff:
LegalForce RAPC Worldwide, P.C.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INITIAL COMPLAINT
CASE NO.: 3:25-cv-7921